Jane PERLMAN; Inger Lawrence, Muriel Lawrence, A. Charles Lawrence; Inger Lawrence, Muriel Lawrence, Edith Lawrence and James J. Lawrence as joint tenants with right of survivorship, Plaintiffs,

v.

C. Russell FELDMANN, Charlotte E. Feldmann, Newport Steel Corporation, now known as Newcorp, Inc., Joseph V. McKee, Jr., Carolyn Otto, Phyllis McKee and Barbara Jane Feldmann, Defendants.

Civ. No. 3086.

United States District Court
D. Connecticut.

July 18, 1957.

Pomerantz, Levy & Haudek, New York City, Saltman, Weiss & Connors, Bridgeport, Conn., Proskauer, Rose, Goetz & Mendelsohn, New York City, Marsh, Day & Calhoun, Bridgeport, Conn., and Manning, Hollinger & Shea, New York City, for plaintiffs.

Sullivan & Cromwell, New York City, Cummings & Lockwood and Curtis, Brinckerhoff & Barrett, Stamford, Conn., for defendants.

ANDERSON, District Judge.

### Findings of Fact

1. The plaintiff Jane Perlman is a citizen of the United States and of the State of New York. The other plaintiffs are all citizens of the United States and of the State of Illinois. The plaintiffs each own shares of the common stock of Newport Steel Corporation which they acquired prior to August 31, 1950.

2. The defendant Newport Steel Corporation, now known as Newcorp, Inc., is a corporation duly organized and ex-

isting under the laws of the State of Indiana, and thus a citizen of that state. The other defendants are all citizens of the United States and of the State of Connecticut and were such at and prior to the commencement of this action.

3. The present action is in this court on a remand from the United States Court of Appeals for the Second Circuit, 219 F.2d 173, for further proceedings to determine the value of the defendants' stock without the appurtenant control over the corporation's output of steel.

4. As of August 31, 1950, Newport had issued 1,221,869.4 shares of common stock of the par value of $1 per share. Of these, 1,078,491.4 shares were outstanding in the hands of stockholders. The remaining 143,378 shares were held by Newport or its subsidiaries as treasury stock.

5. On August 31, 1950, the following persons or corporations owned the following number of shares of the common stock of Newport:

| | |
|---|---:|
| C. Russell Feldmann | 0 |
| Charlotte E. Feldmann | 2,000 |
| Strong, Carlisle & Hammond Co. | 261,000 |
| Henney Motor Co., Inc. | 50,000 |
| Carolyn F. Otto | 7,300 |
| Barbara Jane Feldmann | 7,800 |
| Phyllis F. McKee | 7,300 |
| John F. Otto | 2,200 |
| Joseph V. McKee, Jr. | 2,525 |
| Norman S. Feldmann | 1,000 |
| Raymond D. Feldmann | 1,050 |
| John C. Vega | 600 |
| Josephine V. Vega | 600 |
| | 343,375 |

Strong, Carlisle & Hammond Co. is a corporation approximately 85% of the stock of which was owned by C. Russell Feldmann (hereinafter called "Feldmann") and members of his family. Henney Motor Co., Inc., is a corporation the stock of which was owned 60% by Feldmann, and 10% each by his wife, Charlotte E. Feldmann, and by his three daughters. John F. Otto and the de-

fendant Joseph V. McKee, Jr., are Feldmann's sons-in-law. Defendants Carolyn Otto, Phyllis McKee and Barbara Jane Feldmann are Feldmann's daughters. Norman S. Feldmann and Raymond D. Feldmann are Feldmann's brothers. John C. Vega and Josephine V. Vega are Feldmann's brother-in-law and sister-in-law, respectively.

6. The 343,375 shares referred to in Finding 5 amounted to approximately 33% of the outstanding stock of Newport. If voted as a unit, under the conditions existing on August 31, 1950, this amount of stock would have given the holder working control of Newport.

7. On August 31, 1950, pursuant to an option given on August 24, 1950, the aforesaid 343,375 shares, plus 55,552 shares of stock owned by friends and associates of Feldmann, and directors of Newport, or a total of 398,927 shares of Newport, were sold and delivered to Wilport Company (hereinafter called "Wilport") for $7,978,540 or $20 per share. The stock sold represented approximately 37% of Newport stock and constituted a control block of shares.

8. In selling the 398,927 shares of Newport, Feldmann acted as agent of the owners of said shares, including the other defendants herein, and on his own behalf.

9. Although it is impossible to determine the actual volume of trading in the stock, it apparently enjoyed a broad, fair and active market.

10. On August 24, 1950, the date on which Feldmann gave the option, the over-the-counter price for Newport shares was 8½ bid, 9½ asked. On August 31, 1950, the date of the delivery of the stock, the over-the-counter price was 10⅝ bid, 11⅝ asked.

11. From December, 1940 and until August 31, 1950, Feldmann was the president of Newport. In August, 1950, he was also the chairman of its board of directors. His salary was $75,000 a year. The other four members of Newport's board of directors in August, 1950, were the defendant Joseph V. McKee, Jr.,

Feldmann's son-in-law, Frank L. Taylor, A. F. Lorenzen and Daniel M. Sheaffer.

12. Prior to August 8, 1946, Newport, then known as International Detrola Corporation, was in the business of manufacturing radios and phonographs through its Detrola Division in Detroit; aircraft components through its subsidiary, Rohr Aircraft Corporation; aircraft tools through its Elkhart Tool Division; radio cabinets and cedar chests through its Caswell-Runyan Division; refrigerator units through the Universal Cooler Division and the Universal Cooler Company of Canada; and radio speakers and parts through the Utah Radio Products Corporation in Detroit.

13. In late 1949 Newport disposed of its subsidiaries the Rohr Aircraft Corp., the Universal Cooler Co. of Canada, Ltd. and the Aircraft Tool Division. These subsidiaries had accounted for substantial portions of the company's sales and profits during 1948 and 1949.

14. In August, 1950 the principal business of Newport was the production of steel ingots and the manufacturing of hot rolled steel and sheet steel in its Rolling Mill Division at Newport and Wilders, Kentucky. The other components of Newport's business were the Caswell-Runyan Division, a woodworking operation which manufactured, among other things, jukebox, radio and television cabinets at Huntington and Goshen, Indiana; the Universal Cooler Division which made refrigerator compressors at Marion, Ohio; and a piece of real estate in Detroit, Michigan.

15. The Caswell-Runyan (woodworking) division as of August, 1950 consisted of a plant at Huntington, Indiana, which had about 500,000 square feet of floor spare, many acres of land, and practically all new equipment, and a plant at Goshen, Indiana, consisting of 125,000 square feet of floor space.

16. Prior to August 31, 1950, Newport had planned to sell its Universal Cooler Division, and had made serious attempts to sell it. It was actually sold on October 31, 1950.

17. The plant which Newport had used until 1948 for the manufacture of radios by its Detrola Division, had been unoccupied for two years preceding August, 1950. This property was referred to as the "Detroit property".

18. On August 29, 1950, Newport leased the Detroit property to the U. S. Army Corps of Engineers for a 10½ month period ending June 20, 1951, at a rental of $13,750 a month. The lease gave the Government an option to renew annually for four successive years at a rental of $165,000 per year. The Government was given an option to purchase the property at a price of $1,500,000 less a predetermined and prepaid restoration charge of $191,000.

19. Newport first entered the steel business in 1946. It then acquired for approximately $1,665,000 the plant and equipment of the Andrews Steel Co., located at Newport, Ky., directly across the Ohio River from Cincinnati, and at Wilder, Ky., about one mile south of Newport. The facilities acquired from Andrews consisted of about 200 acres of land, about 1,250,000 square feet of buildings with cranes and auxiliary equipment, together with seven open hearth furnaces, a blooming and bar mill, a sheet mill and facilities for fabricating culvert pipe, eaves troughs, down spouts, garage doors and roofing, and equipment for making galvanized, galvannealed and terne sheets. These facilities were used by Newport as part of one continuous operation: the open hearth furnaces made steel ingots, which were rolled into bar stock in the blooming and bar mill which in turn was rolled into sheets in the sheet mill. The normal product of the sheet mill was hot rolled, low carbon steel sheets. These sheets could be sold as such; or further processed by Newport into galvanized, galvannealed and long terne sheets; or fabricated by it into finished end products such as culvert pipes, eaves troughs, etc. The mill also produced sheets of silicon steel, a specialty steel used in electrical equipment, as well as an alloy steel which was used by aircraft manufacturers in building

airplane frames. These facilities acquired from Andrews were known collectively as the "old facilities". They had been in operation ever since their purchase.

20. The coated sheets, known as galvanized, galvannealed and long terne, and the silicon and alloy sheets were known collectively as specialty steels.

21. On March 31, 1947, Newport acquired a blast furnace located at Martins Ferry, Ohio, at a cost of $175,000. Newport then rehabilitated the blast furnace at a cost of $800,000 and it was put into operation in June, 1947. It was taken out of operation in June, 1949 and through August, 1950, was retained as a standby facility which could be used when required. It maintenance in idle condition cost an average of $10,500 per month. Its reactivation would have cost $300,000 to $400,000.

22. The open hearth furnaces had a rated capacity of about 34,400 tons of ingots per month and produced an average of 24,000 tons per month. The sheet mill had a rated capacity of 15,000 tons per month, but has exceeded that capacity. The average monthly production of the sheet mill was 11,906 tons in 1949. The average monthly production during the eight months to August 31, 1950, was 11,172 tons.

23. The "old facilities" were capable only of high cost operation.

24. The annual earnings before taxes, of Newport's Rolling Mill Division from November, 1946, through August, 1950, were:

| | |
|---|---|
| 1947 | $ 880,746.28 |
| 1948 | 1,907,925.17 |
| 1949 | 510,402.05 |
| 1950 (10 months) | 271,846.59 |

The average annual earnings before taxes for this period thus were $931,548; and the average monthly earnings were $77,629. These were mostly peacetime earnings. The national index of steel production was 72.5% in 1946, 92.9% in 1947, 94.1% in 1948, 81.7% in 1949 and 96.7% in 1950. The earnings of the steel division during that period were less than the separate earnings of the "old facilities", because during that period the steel division had to absorb overhead, starting up costs and, in the aggregate, a net operating loss for the "new facilities", which were not fully installed until May, 1950.

25. It was unlikely that Newport would be able to sell hot rolled, low carbon steel sheets produced by its "old facilities" at a profit if the index of steel production fell to the level of mid-1949 (81%). However, it was likely that Newport would be competitive with any other mill in the fields of alloy and silicon steel. No other mill in the Cincinnati area produced galvanized steel; the nearest mill producing galvanized steel was Armco's plant at Ashland, Kentucky, a little over one hundred miles distant. The market for galvanized steel was local and Newport concentrated on the area within 100 miles of Cincinnati and to the south. In Cincinnati and its immediate vicinity Newport had freight advantage which might permit it to sell galvanized steel at a profit even if the index of steel production fell to 81%. However, in areas approaching equal distance from Ashland, Newport would have difficulty in competing with Armco which sold galvanized steel about $20 per ton less than the price charged by Newport. Armco also manufactured long terne at its Middletown, Ohio, plant about 40 miles from Cincinnati and sold it at approximately $20 per ton less than Newport's price. Whenever demand equalled supply Newport would not be able to sell long terne at a profit. In August, 1950, Newport's profits from its "old facilities" were accounted for as follows: app. 33.8% by sales of hot rolled, low carbon sheets; app. 14.6% by sales of coated sheets (galvanized, etc.); app. 21.5% by sales of alloy and silicon steel; app. 25.5% by sales of the fabricating departments, which make doors, etc.; and app. 3.2% by other items. Newport's management believed that if a drop in demand for steel occurred, the profits of its "old facilities" could be maintained by shifting its production and sales away

from low carbon sheets. Yet it appeared that in 1949, when Newport's sales of steel were cut in half as a result of a drop in demand and the company suffered a loss for some months, no such shift was made. On the basis of the past history of these facilities, it was questionable whether they could be operated profitably if the index for steel production fell to 80% or lower.

26. With respect to Newport's "old facilities": Newport's mill price for hot rolled sheets, 18 gauge and heavier, was, in August, 1950, $11–$27 per ton higher than the prices charged by certain other steel companies. Newport's prices in August, 1950, for electrical, motor, dynamo and transformer (silicon steel were the same as those charged by other producers.

27. Between 1948 and 1950, Newport acquired additional steel facilities, referred to as the "new facilities", consisting of a melt shop containing one electric furnace, acquired from the War Assets Administration in the spring of 1948; two additional electric furnaces installed in the melt shop which were put in operation in March and May, 1950; an additional large building acquired from the War Assets Administration in the spring of 1948; and a reversing hot strip mill for the production of hot rolled steel strip, installed in said building in late 1948 and early 1949. These facilities, together with the pipe mill, referred to infra, were intended to be and were operated as a unit. They were adjacent to Newport's "old facilities" in Wilder, Ky. The facilities acquired from the War Assets Administration were obtained at a price of $1,350,-000. The final cost to Newport of its "new facilities", as they existed when completed, was $10,798,000.

28. Although Newport's "new facilities" were originally scheduled for completion in August, 1948, the actual completion was long delayed and they had never achieved their expected normal production by August 31, 1950.

29. The electric furnaces had a theoretical rated capacity of 24,300 tons of ingots per month; they were expected to have a normal monthly production of 22,000 tons per month. The last of the three furnaces was placed in production in May, 1950. Actual production during the four months starting in May was as follows:

| May, 1950 | 14,963 | Tons of Ingots |
| June, 1950 | 15,984 | " " " |
| July, 1950 | 15,072 | " " " |
| Aug., 1950 | 16,506 | " " " |

30. The theoretical rated capacity of the strip mill was 25,000 tons per month although it was capable of producing somewhat more. If all the normal 22,000 per month output of the electric furnaces were put into the strip mill, 18,700 tons of sheet and coil would be produced as the yield of the strip mill was 85%. Additional strip mill production could have been obtained by converting ingots bought from other mills or furnished by customers. The strip mill first went into production in May, 1949, but until December, 1949, it never produced more than 5,500 tons per month. Its actual production from December on was as follows:

| Month | Tons of Strips & Coils |
| --- | --- |
| December, 1949 | 6,611 |
| January, 1950 | 5,329 |
| February, 1950 | 7,108 |
| March, 1950 | 11,129 |
| April, 1950 | 10,475 |
| May, 1950 | 9,140 |
| June, 1950 | 12,827 |
| July, 1950 | 7,967 |
| August, 1950 | 16,314 |

During these months none of the strip mill's production was obtained from ingots furnished by customers or purchased from other mills.

31. As of August, 1950, it was reasonable to assume that the "new facilities" would soon attain a close approximation of their expected normal monthly production, but that it would take about a year to achieve completely smooth production from the "new facilities".

32. In contrast to open hearth furnaces which use pig iron as part of their

"charge", the raw material used in electric furnaces is scrap. Steel produced by electric furnaces is of better quality than steel produced by open hearth furnaces.

33. In August, 1950, Newport was paying the same price for scrap as were other steel companies in the same area, but because the electric furnaces required a higher grade of scrap and because Newport did not maintain a large supply of scrap on hand, Newport's average cost per ton of scrap was higher than that of the "Big Six".

34. Newport's reversing strip mill was a modern automatic mill, one of the first of its type, although similar mills have since been built by other steel companies. It compared favorably with the new strip mill of Crucible Steel Co., which was a competitive mill.

35. The principal competitors of Newport's new steel facilities were the big steel mills, like those of the "Big Six" which were: Armco, Bethlehem, Inland, Jones & Laughlin, Republic and U. S. Steel.

36. At the time that the "new facilities" were first contemplated, it was estimated that Newport's costs in operating them, aside from raw material costs, would be about $5 per ton higher than the "Big Six" when the facilities were operating at full normal production. During the first ten months of fiscal 1950 Newport's *average* costs for hot strip from the "new facilities" were higher than "Big Six" prices for the same product; but by August, 1950, Newport's actual conversion costs were only slightly higher than those of the "Big Six" and it was selling its hot strip at the "Big Six" price. Unit costs tend to decrease as a steel mill approaches capacity production.

37. To finance the "new facilities", Newport, in 1948, borrowed $10,000,000 from four of its steel customers, one of which was General Motors. In connection with these loans, Newport contracted to sell to the lenders a substantial part of its future steel output in specified monthly tonnages at "Big Six" prices plus a premium of $20 to $25 per ton. Newport's loan indebtedness was to be retired out of these premiums.

38. Due to the difficulties in getting the "new facilities" into production, Newport was unable to make the deliveries called for in the loan contracts, and by early 1949 was hopelessly behind in deliveries. Out of the $10,000,000 borrowed, approximately $1,200,000 was earned by the $20 per ton premiums on steel delivered, leaving a balance of approximately $8,800,000 owing. In December, 1949, Feldmann made a settlement of this indebtedness by payment of 50 cents on the dollar. Newport sold Rohr Aircraft Corporation, Universal Cooler of Canada and the Elkhart Tool Division and used a part of the cash received from these sales to effectuate the settlement. As part of the settlement, Newport had to grant General Motors a 42-month option to buy 10,000 tons of steel per month from Newport's "new facilities" at "Big Six" prices without any premium until June, 1953. The General Motors option was still in effect in August 1950. In that month Newport charged the same base price for its hot rolled sheets produced by the "new facilities" as was charged by the lowest priced steel producers for the same product and Newport's prices for extras were likewise the same. No other steel producer sold the same product at a lower price and some charged higher prices. A prospective purchaser of the enterprise as of August 31, 1950, might reasonably assume that with proper management, the "new facilities" would be capable of low cost production.

39. The market for hot rolled steel in coil and cut lengths in the area within 150 miles of Cincinnati was five to seven times Newport's capacity production of that product. Armco's plant at Ashland a little over 100 miles east of Cincinnati supplied a part of this demand at "Big Six" prices but within other portions of the area the demand was served in part by Newport which in those portions had the advantage of lower freight rates which, since steel prices are F.O.B. mill,

might enable Newport, at a time when the index of steel production in the United States is 90–95%, to sell all the production of its "new facilities", even if Newport's prices were $4 or $5 per ton higher than the "Big Six."

40. In March, 1950, Newport purchased a slightly used pipe mill from International Rolling Mills Products Corp. for $450,000. The pipe mill, which had not yet been placed in operation in August, 1950, was intended to use steel produced by the hot strip mill, and as of that date the cost of the pipe mill to Newport—and its book value—stood at $491,763.

41. Neither the inconclusive negotiations between Newport and Follansbee Steel Corporation and the claimed bases for various offers and counter-offers nor the testimony concerning the sale of the physical properties and inventory of Portsmouth Steel Co. contributed any reliable or persuasive evidence of facts which can, to an appreciable degree, contribute to a determination of the value of Newport stock on August 31, 1950. The relative circumstances are not sufficiently comparable.

42. The Korean War commenced on June 26, 1950.

43. In the 10-year period prior to August, 1950, the steel industry in the United States was, with the exception of a short period in 1949, in a boom condition. There was a scarcity of steel in 1946, 1947 and 1948 as well as during the summer of 1950; the market for steel was tight through August, 1950; and it was then reasonably foreseeable that it would remain so for more than a year to come. In July and August, 1950, the demand for the steel produced by Newport far exceeded its then capacity.

44. Newport was situated on the east embankment of the navigable Licking River, making it possible at some future time, with the expenditure of about $300,000, to install barge loading facilities through which shipping costs of raw materials and products could be reduced.

45. There was room available in the "new facilities" for a fourth electric furnace but there is no evidence that Newport on August 31, 1950, contemplated the installation of such a furnace.

46. In 1948 and in some other years Newport had suffered flood damage and interruption of production from the overflow of the river. By August, 1950, the Federal Government was in the process of building a levee along the river which would protect the "old facilities" at Newport from further flooding. This project was well along toward completion at that time. The "new facilities" at Wilder were located on higher ground which had not been subject to flood damage. The open hearths, blooming and bar mills of the "old facilities" at Wilder were, however, still vulnerable to flooding. Newport, by allowing the Government to dig gravel on Newport land to use in building the levee, obtained approximately 50 acres of level ground instead of a hill which was of no value.

47. In August, 1950, Newport owned sufficient land area to install a continuous pickling plant and cold rolling mill—additions which were inconclusively discussed by Newport's management, during or prior to that time.

48. During the late spring and early summer of 1950, when as above stated the steel market was tight, Feldmann began receiving numerous inquiries from persons interested in a possible purchase of his stock interest in Newport. William J. Mericka told Feldmann that he represented a group of end users of steel which might be interested in acquiring all of Feldmann's holdings in Newport Steel. Feldmann indicated that he might consider selling to such a group and said that he would not consider less than $22 per share.

49. The dominant motive of this purchasing group in seeking to purchase Feldmann's controlling stock interest in Newport was to obtain a continuing source of steel supply. Feldmann knew during the negotiations that such was their motive.

50. On August 29, 1950, the purchasing group comprised of sixteen members, all of them end users of steel, or-

ganized a Delaware corporation known as Wilport Company, for the purpose of purchasing and holding the Newport stock covered by the option agreement.

51. On or before August 31, 1950, the Wilport stockholders informally agreed among each other that they were to have the privilege of buying steel from Newport in proportion to their respective investments in Wilport. They intended, if possible, to buy about 15,000 to 20,000 tons of steel per month from Newport.

52. On August 31, 1950, Feldmann went to Chicago, Ill. and there, at that time, Wilport exercised the option which Feldmann had given to Mericka on August 24th and which Mericka had thereafter assigned to Wilport. Feldmann received $7,978,540 in payment for 398,927 shares at $20 a share. Included in the above amount Feldmann received from Wilport was a premium for control of Newport's end product over and above the investment value of control of Newport as a business enterprise. Feldmann knew that in paying him $20 per share the Wilport company was paying him a bonus or premium for control of the end product of Newport's steel division.

53. After the consummation of the sale, Feldmann convened a special meeting of Newport's board of directors.

After the meeting was convened, the directors of Newport successively resigned and, as each vacancy arose, the Board elected successively as new directors a slate of directors proposed by Wilport.

54. Each of the new directors of Newport was a director of Wilport.

55. The book value of Newport on August 31, 1950, was $17.03 per share, comprised as follows:

Assets:

| | |
|---|---|
| Cash and Receivables | $ 4,448,364 |
| Inventories | 7,957,317 |
| Property, Plant and Equipment, less depreciation | 14,979,662 |
| Other Assets | 648,029 |
| Total | $28,033,372 |

Liabilities:

| | |
|---|---|
| Current Liabilities | $ 4,803,194 |
| Other Liabilities | 3,204,571 |
| Reserves | 1,653,461 |
| Capital and Surplus | 18,372,146 |
| Total | $28,033,372 |

56. The property, plant and equipment (less depreciation) of Newport's various divisions was as of August 31, 1950:

| Division | Net Book Value | |
|---|---|---|
| Rolling Mill Division: | | |
| Newport, Kentucky | $ 723,931 | |
| Wilders, Ky.—Old Facilities | 441,955 | |
| Wilders, Ky.—New Facilities | 10,315,894 | |
| Pipe Mill | 491,763 | |
| Martins Ferry, Ohio | 819,186 | |
| | | $12,792,729 |
| Refrigeration Division: | | |
| Marion, Ohio (Universal Cooler) | | 1,138,767 |
| Radio Division: | | |
| Detroit, Michigan | $ 367,630 | |
| Huntington, Indiana (Caswell-Runyan) | 489,891 | |
| Goshen, Indiana (Caswell-Runyan) | 190,642 | |
| | | 1,048,163 |
| Total | | $14,979,659 |

57. The "sound value" for the purpose of insurability of Newport's steel facilities as testified by Manufacturers' Appraisal Co. to be about $37,000,000 on August 31, 1950, exceeds the then fair market value.

58. Under the lease of the Detroit real estate entered into between Newport and the Government in August, 1950, which provided for an annual rental of $165,000, the net annual income to Newport after deduction of property taxes and insurance, but not income taxes, would be $132,600.

59. The appropriate rate of capitalization for such real estate in Detroit on August 31, 1950, was 8%. This would yield a capitalized rental value of $1,675,000.

60. If the Government, on August 31, 1950, had exercised its option to purchase the property for $1,500,000, minus $191,000 of prepaid restoration charges, the net proceeds to Newport would have been $1,073,658, after deduction of capital gains tax at the rate of 25%.

61. The value of the Detroit plant on August 31, 1950, was $1,073,658.

62. The value of the Universal Cooler Division on August 31, 1950, was $2,718,051.

63. From 1945 to 1949 the Caswell-Runyan division included a radio speaker and parts manufacturing company known as Utah Radio Products Corporation and a woodworking division which together were referred to as the combined Huntington Operations of Newport. In 1946 and 1947 the combined Huntington Operations showed losses despite the fact that the woodworking operation taken separately showed profits before taxes. At the end of 1949 Utah Radio was discontinued. The net earnings before taxes of the woodworking operation of the Caswell-Runyan division for the fiscal years 1946-1950 were as follows:

| | |
|---|---|
| 1946 | $ 39,235 |
| 1947 | 68,151 |
| 1948 | 368,808 |
| 1949 | 132,102 |
| 1950 | 759,031 |

In 1948 Caswell-Runyan began the production of television cabinets and in 1948-1950 radio and television cabinets were the largest item in Caswell-Runyan's sales by dollars.

64. The August 31, 1950, book value of the inventory and depreciated property and plant of the Caswell-Runyan division was $1,587,110 and its net book value was then $2,284,318.

65. In August, 1950, it was reasonably foreseeable that the Federal Government would make provisions for an excess profits tax to take effect in the almost immediate future. This excess profits tax could be reasonably expected to bring to 65% the total tax on Newport's earnings.

66. By annualizing Caswell-Runyan's earnings for the first ten months for fiscal 1950 a yearly earnings of $696,000 is reached, which is the reasonably foreseeable average yearly net earnings before taxes of Caswell-Runyan.

67. As of August 31, 1950, the foreseeable average annual net earnings after taxes, including excess profits tax, of the Caswell-Runyan division were $243,600.

68. Capitalizing the earnings after taxes at a 20% rate, the capitalized earning power of Caswell-Runyan would be $1,218,000.

69. To compute the value of Caswell-Runyan at that time, weight should be given to earnings in the proportion of 66⅔% and to assets or net book value in the proportion of 33⅓%.

70. The value of Caswell-Runyan as of August 31, 1950, was $1,573,439.33.

71. Considering the condition of business generally, and the impact of the Korean war (beginning on June 26, 1950), it was reasonable to estimate in August, 1950, that the steel industry would produce at or above capacity for a minimum of two years, and probably for a longer period.

72. The annual earnings, before taxes, of Newport's Rolling Mill Division

from November, 1946, through August, 1950, were:

| | |
|---|---|
| 1947 | $ 880,746.28 |
| 1948 | 1,907,925.17 |
| 1949 | 510,402.05 |
| 1950 (10 months) | 271,846.59 |

73. The earnings, before deduction of *general expenses* and taxes, of the "old steel facilities" of Newport's rolling mill division were:

| | |
|---|---|
| In April, 1950 | $189,407 |
| In May, 1950 | 244,048 |
| In June, 1950 | 408,520 |
| In August, 1950 | 331,559 |

The figures for April, May and August, 1950, are those appearing on the Company's records. The June, 1950, Company figures have been adjusted from $441,029 to $408,520 to correct for transfers below cost from the "new facilities" to the "old facilities."

74. The earnings, before deduction of general expenses and taxes, of the "new steel facilities" of Newport's rolling mill division were:

| | |
|---|---|
| June, 1950 | $ 67,794 |
| August, 1950 | 111,991 |

75. In the ten months ending August 31, 1950, the sales and earnings before taxes of Newport's rolling mill division were as follows:

| Month | Net Sales | Profit before Taxes |
|---|---|---|
| November, 1949 | $1,191,356 | $266,025 (loss) |
| December, 1949 | 2,122,654 | 205,273 (loss) |
| January, 1950 | 2,675,391 | 21,775 |
| February, 1950 | 1,991,305 | 119,018 (loss) |
| March, 1950 | 2,355,235 | 95,179 (loss) |
| April, 1950 | 2,573,165 | 145,474 |
| May, 1950 | 2,976,165 | 131,179 |
| June, 1950 | 3,530,782 | 353,885 |
| July, 1950 | 2,005,383 | 20,653 |
| August, 1950 | 3,724,733 | 284,375 |

A strike which had started in October, 1949, continued through November 10th. The division was partially shut down in July for employee vacations. Business conditions in the steel industry improved in early 1950 and Newport was able to raise some of its prices for the products of its "old facilities" in May and again in June, 1950. The index of national steel production for the calendar year 1950 was 96.7%. Production of the strip mill improved from 6,611 tons in December, 1949, to 12,827 tons in June, 1950. The second electric furnace was brought into operation in March, 1950 and the "new facilities" were completed when the third furnace went into production in May, 1950. During the vacation shutdown in July, 1950, many of the bugs in the strip mill operation were remedied and production in August, 1950, increased to 16,314 tons.

76. The production of the "old facilities" of carbon, silicon, alloy and coated sheets remained on approximately the same level throughout April, May, June and August, 1950. July, 1950, was a vacation month and the "old facilities" were shut down for two weeks during the month. As between June and August, 1950, production was higher in August in the case of each of the type of sheets produced by the "old facilities." Production of the open hearth furnaces also was slightly higher in August.

77. If the electric furnaces which comprise part of the "new facilities" were to produce their "normal" monthly production of 22,000 tons and all of this production were utilized in the strip mill, Newport would then have 18,700 tons of hot strip and coil to sell. If this amount were sold at the price of $80 per ton in effect on August 31, 1950, the total sales

would be $1,496,000. In producing this amount of strip and coil Newport would probably incur costs in the amount of $1,334,273, leaving a monthly profit of $161,727.

78. In addition to 18,700 tons of hot strip which could be produced from the new electric furnace ingot production, the strip mill would have an excess capacity of at least 6,300 tons per month. This excess capacity might profitably be used in the future to convert ingots for customers or other steel mills.

79. The average earnings before taxes of the old and new steel facilities for June and August, 1950, gave, as of August 31, 1950, a close approximation of their reasonably foreseeable future monthly earnings after that date except for the probable increase in the earnings of the new facilities.

80. The reasonably foreseeable increase in the monthly earnings of the new facilities after August 31, 1950, over and above their June-August 1950 average was $71,835 before deduction of general expenses and taxes. The estimated share of the probable general expenses allocable to the increased earnings of the new facilities was $24,500 per month, leaving a monthly increase in earnings before taxes of $47,335 or an increase for 11½ months of $544,352.50.

81. As of August 31, 1950, the foreseeable average net earnings before taxes of the Newport steel division, excluding the pipe mill, was $4,214,347.50 per year.

82. As of August 31, 1950, the annual earnings of the steel division, excluding the pipe mill, after taxes including an excess profits tax, was $1,475,021.63.

83. Capitalizing the earnings after taxes at a 18.1818% rate, the capitalized earning power of the steel mill division would be $8,112,619.

84. The net book value of the steel division of Newport on August 31, 1950, including property, plant, equipment (less depreciation), inventory, cash, receivables and other assets, but excluding the pipe mill, was $12,753,237.

85. To compute the value of the steel division at that time weight should be given to earnings in the proportion of 60% and to assets or net book value, excluding the pipe mill, in the proportion of 40%.

86. The value of the Newport steel division as of August 31, 1950, was $9,968,866.20.

87. The book value of the pipe mill was $491,763 which was its fair value on August 31, 1950.

88. The fair value of Newport Steel Corporation as an enterprise on August 31, 1950, was $15,825,777.53.

89. Newport Steel Corporation had the same value on August 24, 1950.

90. The value of each share of the capital stock of Newport Steel Corporation was, on August 31, 1950, $14.67.

### Conclusions of Law

91. The difference between $14.67 and the $20 per share received by the defendants constituted a premium or bonus paid by Wilport Company for control over Newport's output of steel.

92. The bonuses or premiums of $5.33 per share for the 398,927 shares sold by the individual defendants (i. e. those other than Newport Steel Corporation, now Newcorp, Inc.) to the Wilport Company total $2,126,280.91. The Wilport Company shares, which are barred by the judgment of the Court of Appeals from recovery in this proceeding, constituted 36.99% of the outstanding shares of Newport. This percentage of the $2,126,280.91 amounts to $786,511.29 which, deducted from the $2,126,280.91, leaves $1,339,769.62 due by the individual defendants to the plaintiffs and those whom they represent, i. e. the present holders of the shares of Newport outstanding on August 31, 1950, other than the present holders of any of the shares then transferred to the Wilport Company; the plaintiffs and such qualified present holders of shares will take in proportion to the number of shares each holds.

93. Judgment may enter for the plaintiffs and those whom they represent

to recover from the defendants the sum of $1,339,769.62 with interest at 6% per annum from August 31, 1950, and their costs.

94. An order will subsequently issue appointing a special master to determine who, in accordance with the terms of the judgment to be entered on this Memorandum, are the particular persons which or whom the plaintiffs represent and the portion of the judgment to which each is entitled.

## Discussion

This case was remanded to this court by the Court of Appeals for a determination of the value of the defendants' stock without the appurtenant control over the corporation's output of steel.

Besides the evidence presented at the present trial it was agreed by the parties that, except for portions objected to by a party and excluded by the court, all of the evidence presented at the first trial would be considered a part of the evidence before the court on the issues presented at the second trial. Prior to the commencement of the second trial the court ruled that it would not receive evidence of actual events subsequent to August 31, 1950, on the issue of the value of the shares of Newport on that date. The parties urged that this rule was too stringent and stipulated that evidence of subsequent occurrences be admitted for the limited purpose of testing the weight and validity of assumptions and prognoses made by experts as of August 31, 1950. After a lengthy chambers conference and in compliance with the court's position that some reasonable limit should be placed upon the period for which evidence of subsequent events could be admitted, it was understood by the court and the parties that two years from August 31, 1950, would be recognized as the period so limited.

What Judge Hand said in Guggenheim v. Helvering, 2 Cir., 117 F.2d 469, 473, at the end of head note reference (1) is expressive of what the court had in mind with regard to post August, 1950, occurrences:

"Only so far as present opinion is composed in part of a forecast of the future can the future be supposed to have anything to do with it; and it really has none even then, because a forecast of the future is an entirely different thing from the actual future which will confirm or falsify it."

This court thus placed considerable emphasis upon the reasonableness of what was foreseeable on August 31, 1950. The purchasers took steps to familiarize themselves with corporate earnings and other pertinent data of interest to them right up to the date of exercising the option. There were factors present which in the light of current trends could reasonably be projected into the future. The two-year limitation was not a limit on the range of the opinion anyone interested might have had on August 31, 1950, but was chosen as the fairest method of putting a quantitative limit on the corroborative force of actual future events.

The finding incorporates many of the findings made at the first trial, some wholly unchanged, some modified in the light of evidence presented at the second trial. As the Court of Appeals said, many of the essential facts are not in dispute. Due consideration has been given to the ruling that the burden of proof rests upon the defendants as to the value of the stock and the other issues relating to a breach of fiduciary duty, and not upon the plaintiffs.

The problem has been to find the fair market value of the Newport Steel Corporation as a going concern, i. e. its enterprise value, on August 31, 1950. For the purpose of evaluating the control block shorn of the power to control the corporation's output of steel, the court has accepted the mathematical sequel of dividing the enterprise value of the corporation by the number of shares outstanding and multiplying the result by the number of shares in the block.

What special value there may have been to an investor in being able to manage the corporation without controlling or having any particular interest in using the product or channeling its distribution to end users in which he was interested, is implicit in the factors going to determine enterprise value. In this case it is found that the difference between the value of the block thus arrived at, and the amount paid the individual defendants by the Wilport Company constituted a bonus or premium paid the individual defendants by the Wilport Company to control the corporation's output of steel.

The conclusion as to enterprise value of the Newport Steel Corporation on August 31, 1950, was arrived at by the experts for the plaintiffs and the experts for the defendants by somewhat different means. Each tended to emphasize factors which were helpful to the side for which he was testifying. The plaintiffs' expert gave great weight to records of earnings for several years prior to August 31, 1950 and little weight to changes in means and equipment for production and sales in the few months preceding August, 1950, the changes in demand for products and the reasonably foreseeable consequences of these changes in the period following August 31, 1950. The defendants' expert, on the other hand, relied heavily on a projection into the future of the higher earnings achieved in the recent past plus increased or normalized earnings by the new steel facilities, insufficiently tempered by the negative consideration of increased taxes.

The court has been greatly assisted by observing the tools used by the experts and their procedures in using them; but it has adopted the final conclusion of neither.

In broad aspect the court has concluded that the defendant has sustained its burden of persuading the court of the justification for using earnings of the steel division after May, 1950 and earnings of Caswell-Runyan for ten months preceding August 31, 1950, as the bases for projected future earnings for those divisions as opposed to the longer prior period of several years urged by the plaintiff; but the court is equally well persuaded that any reasonably prudent investor considering the circumstance of the Korean war and the accompanying boom would have foreseen the imposition of an excess profits tax with a consequential increase in taxes to 65% of earnings or a percentage very close to it. It would, if possible, have been preferable to average the earnings for June, July and August, but July was broken up by vacations and its inclusion would improperly distort the figures; therefore, an average of June and August has been used.

By the end of May 1950 the "new facilities" which had been in the process of being installed over the period of the preceding two years, were completed, the last electric furnace having been put in in May. Between then and the end of August the "new facilities" were demonstrating what might reasonably be expected of them. By the end of that time they appeared to stand on the threshhold of achieving full or normal production. The Korean War started June 26th. The circumstances leading up to it, and the impact of the war itself created rising prices and a heightened demand for steel and other goods. The plaintiffs object to any emphasis at all on these changed economic conditions, but the resulting boom and the gray market conditions, pointing up the demand for steel, should not be considered as a factor showing that the defendants received a premium for their block of stock and at the same time be denied or disregarded in considering enterprise value as of August 31, 1950. The defendants object to the use of the August figures because they are not as representative of the full earning capacity of the "old facilities" as are the figures for June, and even June obviously could reflect only the circumstances leading up to the inception of the war and not the full impact of the war itself. Yet the consideration of circumstances which cause the averaged figures for June and August to fall short

of absolute full capacity are what make them reasonable and realistic.

It was foreseeable that the high demand for steel would continue for at least two years. It was also reasonable to assume that the new facilities would very soon after August 1950 reach full production. To compute the increase in earnings after August, 1950, attributable to the new facilities the method used by the defendants' expert and adopted by the plaintiffs' expert was followed, but the finding was limited to the increase over and above the forecast based upon the June-August average. The result was subjected to the deduction of general expenses based on the formula of the plaintiffs' expert, and this result was treated to the application of the 65% tax rate for earnings after taxes. Failure to discount the projected increased earnings of the "new facilities" to account for any short delay in achieving full production by them is offset by and the estimate of increased earnings is made somewhat more conservative by making no allowance for the 6,300 tons per month of excess capacity of the strip mill which, as the evidence showed, was available for converting ingots of customers or of other steel mills.

The court also considered the detrimental effect of Newport's contract with General Motors whereby General Motors was given an option to take at a formula price 10,000 tons of steel per month for a period of 42 months but the negative weight given this contract is somewhat tempered by the evidence that General Motors was not holding Newport to the contract price but was paying current Newport prices.

With regard to the tax rate, the defendants take the position that an excess profits tax was not then foreseeable, which is not convincing; and the plaintiffs claim they did not use it because their computations were based entirely upon past earnings. However, the plaintiffs did give some claimed weight to it in making an arbitrary 25% reduction of the defendants' expert's new facilities' earnings forecast which the plaintiffs adopted as a starting point for estimated future earnings. In any event, it would be most unlikely that a prospective purchaser of the enterprise on August 31, 1950, would not have foreseen and made allowance for an excess profits tax, which makes it reasonable to assume a total tax of about 65% with which a purchaser would have to reckon.

Although the plaintiffs' expert in some of his methods of computation gave a weight of 25% to asset value and 75% to earnings, it is the court's opinion that a greater weight should be given to the assets factor and that greater weight should be given to assets in the steel division than in the Caswell-Runyan division. While the ultimate use of capital equipment is to gain earnings, in a wartime economy there is a direct accession to the dollar value of plants, machinery and tools, particularly going concerns, from inflationary forces which have accompanied every war in history, and from the cost and difficulty of procuring materials and equipment for setting up new and additional plants. There was evidence that in the summer of 1950 these forces were already at work, and it was reasonable to assume that they would continue. Therefore, instead of the 25% used by the plaintiffs' expert, the court has found that the assets-earnings proportion in the valuation should be 40% assets—60% earnings for the steel division and 33⅓%–66⅔% for Caswell-Runyan.

In deciding what multiplier to use in determining enterprise value on the basis of an earnings figure, that is, what rate of capitalization to use, both experts computed and gave some weight to price-earning ratios of other steel companies' stocks. The plaintiffs' expert used the earnings of selected companies in the period January 1947 to September 1950; the defendants' expert used current earnings of certain companies as of 1950. The plaintiffs' expert used his market-derived multiplier of 5.2 in computing value on past earnings but upped it to 6 for computing value on estimated future earnings. The defendants' expert, pro-

ceeding from a much less narrow base, derived his multiplier not only from price-earnings ratio derived from a study of selected steel companies but also from broad factors of judgment and experience applied to the nature and condition of the business, both the beneficial and adverse factors to be encountered in its operation, and its position in the economy. He to some extent considered the impending excess profits tax in arriving at his multiplier. Although he fixed a lower multiplier for the old facilities and a higher one for the new, he actually used a composite multiplier of 5 for the steel division as a whole.

While the defendants' expert's method of deriving the multiplier seems the better conceived, the court does not agree with his judgment that the valuation should omit direct consideration of excess profits taxes and merely give them indefinite weight in arriving at the multiplier. Nor does the defendants' expert appear to be justified when he says that if the excess profits tax had been first deducted from earnings he would have arbitrarily raised the multiplier to a figure about double the 5 which he used.

The excess profits tax, while not precisely known in August, 1950, was reasonably foreseeable at some percentage within a range of reasonableness and could be given express and separate mathematical application. The court has therefore taken the excess profits tax into account in computing the estimated future net earnings after taxes. The multiplier is then applied to those tax reduced net earnings.

After considering the elements testified to by the experts and applying its own judgment to their conclusions, the court is of the opinion that a proper multiplier for the steel division is 5.5, and this is applied not only to the old and new facilities' estimated future average yearly earnings (obtained by annualizing the average of earnings in June and August 1950) but also to the probable increase in earnings of the new facilities, which, though probable, are thus weighted downward to a small degree from any

higher multiplier which might be indicated by their newness because the quality of "probability" is not quite as good as the reasonably foreseeable repetition of something already performed at least once. The court is mindful that the choice of any particular multiplier is of necessity somewhat arbitrary, but it is the only way of using earnings to arrive at the main goal of the valuation proceeding—enterprise value.

As to the Caswell-Runyon woodworking division: the use of $696,000, an average of the ten months' earnings from November, 1949, through August, 1950, annualized, for a prognosis as of August 31, 1950, seems justified under the circumstances. It was not necessary to have the hindsight judgment from knowing that the ensuing twelve months' earnings before taxes would total $832,823. The twelve months preceding August 31, 1950, showed earnings before taxes of $733,941.27. The demand for television and radio cabinets was in August continuing in full swing. While an astute purchaser might have foreseen the overproduction of television sets in the second ensuing year followed by a falling off of earnings to $355,752, it is likely that a purchaser would consider that the war-time economy and the accompanying boom would call for something which this division could supply. It was recognized as a volatile business, but the conservative multiplier of 5 used after an application of a 65% tax rate makes full allowance for this characteristic and the exigencies of the business generally.

The Universal Cooler division was on August 31, 1950, the subject of negotiations for a sale which was consummated on October 31, 1950. It was found to be worth its asset or book value and the experts were confirmed by its sale slightly in excess of book value two months later. As the plaintiffs point out, the earnings of this division were extremely erratic, which would indicate that earnings alone cannot always be relied upon for value in an economic atmosphere such as that which existed in August 1950.

The pipe mill was valued at its cost by the defendants' expert, and this was found to be entirely reasonable and proper; but his claims of foreseeable income, as the court found at the first trial, are entirely too speculative and could not be adopted.

The court adopted the defendants' expert's appraisal of the Detroit real estate based upon capitalization of net rental at 8% to arrive at $1,657,000, which had to be reduced by the limiting factor of an option to the federal government to purchase at $1,073,658, which was found to be the value on August 31, 1950.

The plaintiffs' expert devoted considerable testimony to the market price of small lots of Newport and evidently held the opinion that the various prices were strongly corroborative of his analyses and almost conclusive evidence in themselves. This claim is not persuasive, however, for small lot sales were not an indication of Newport's enterprise value on August 31, 1950. They did not reflect the value of controlling a steel company as an investment in an enterprise under the circumstances attendant upon Newport at that time. The sales of stock to Feldmann by his friends and associates were not arms-length transactions but were flavored by the intention of doing Feldmann a favor as a return for past favors. There were meritorious considerations involved which render the transactions of little or no weight in establishing value.

After considering all of the evidence relative to the various divisions of the Newport Steel Corporation the court has adopted what it has conceived to be the methods best adapted to disclose the fair market value of each of the divisions as part of the going concern. The total of the values of each of these divisions has been found to be $15,825,777.53, which is the enterprise value of Newport Steel Corporation. Each share therefore had a fair market value on August 31, 1950, of $14.67 and the premium or bonus per share was $5.33.